******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* FRANCISCO NAVARRO
(AC 37724)

DiPentima, C. J., and Alvord and Schaller, Js.

*Argued February 1—officially released April 25, 2017*

(Appeal from Superior Court, judicial district of
Fairfield, Kavanewsky, J.)

*Deren Manasevit*, assigned counsel, with whom, on the brief, was *Neal Cone*, senior assistant public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, was *John C. Smriga*, state's attorney, and *Tiffany M. Lockshier*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Francisco Navarro, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit burglary in the first degree in violation of General Statutes §§ 53a-49 and 53a-101 (a) (3), threatening in the second degree in violation of General Statutes § 53a-62, and interfering with a police officer in violation of General Statutes § 53a-167a. The defendant's identical twin brother, Jose Navarro (Jose), was charged with, and convicted of, the same offenses as the defendant and, in addition, with assault on a police officer, after the joint trial at which they were jointly represented by defense counsel. On appeal, the defendant claims that (1) the court violated his sixth amendment right to conflict free representation by conducting an inadequate inquiry into whether a conflict of interest had arisen in the joint representation and (2) counsel rendered ineffective assistance by representing him during plea negotiations, trial, and sentencing while burdened by an actual conflict of interest. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On May 29, 2013, at 12:42 a.m., the victims, Joseph Kenney and Sharon Root, were awakened by the sound of two men, later identified as the defendant and Jose, whistling and yelling outside their first floor apartment window. Annoyed by the disturbance, Kenney went to the window and asked the men, "What the fuck do you want?" and "who are you looking for?" One of the men replied, "Shut the fuck up, white boy. I'll fuck you up." After a further exchange, the defendant and Jose came up to the victims' apartment windows. The defendant attempted to pull the security bars off one of the windows while Jose attempted to pull the frame off the unbarred window next to it.

As the situation escalated, Kenney told Root to stay as far as she could away from the window, grabbed a framing hammer, and made a series of calls to 911. The defendant and Jose continued to attempt to gain access to the apartment. As they did so, the defendant and Jose continued to yell at the victims, threatening at one point to get a gun, shoot Kenney, and rape Root. Kenney testified that the defendant was "more aggressive" than Jose was during the attempted burglary. For example, the defendant at one point retrieved a plank of wood, which was discarded nearby, and used it to hit the security bars. He also attempted to kick in the rear entrance door to the house while saying "I'm going to get in."

After a few minutes, the sound of police sirens could be heard and the defendant and Jose left the scene on foot. As one of the responding police officers, Officer

Tom Harper, approached the defendant and Jose, he asked them to remove their hands from their pockets for safety reasons. The defendant and Jose refused to comply with this request and began yelling that they knew their rights and that they did not do anything wrong. Harper then approached the defendant, who was closest to him, in an attempt to detain him and frisk him for weapons. The defendant continued to ignore Harper's request that he show his hands, and he became combative, yelling and pulling away as Harper attempted to place him in handcuffs. Around this time, three additional officers arrived on the scene. One assisted Harper in detaining the defendant while the other two attempted to detain Jose, who, like the defendant, was refusing to remove his hands from his pockets, was yelling at officers, and was attempting to get away. Eventually, the four officers subdued the defendant and Jose and placed them in separate police cruisers.

Once in their respective police cruisers, the defendant and Jose continued to struggle, yelling and kicking against the cruiser. Officers testified that Jose was more aggressive than the defendant was during the arrest process. First, Jose attempted to kick out the windows of the police cruiser. He then managed to bring his handcuffs under his body and around to the front, and he began banging the handcuffs against the police cruiser windows. Officers asked Jose to step outside of the vehicle so that they could fix his handcuffs, but he refused to comply and became combative. Eventually, officers were able to remove Jose from the police cruiser and move his handcuffs into the correct position. After officers placed him back inside the police cruiser, Jose continued to kick and scream.

When officers detained the defendant and Jose, Kenney was brought to the arrest location so that he could verify whether the defendant and Jose were the men that attempted to break into his and Root's apartment. Kenney positively identified both the defendant and Jose. During the course of the identification process, the defendant was brought outside of the police cruiser, but Jose, because of his combative behavior, could not be let out of the police cruiser safely, and Jose had to remain inside the police cruiser while Kenney identified him.

After Kenney positively identified the defendant and Jose, they were transported to a police station for booking. Once at the police station, the defendant and Jose remained combative, screaming profanities and refusing to comply with orders from the officers. As a result, they were placed in holding cells to complete the booking process. While inside his cell, Jose spat on one of the officers assisting in the booking process.

The defendant and Jose subsequently were charged with attempt to commit burglary in the first degree,

threatening in the second degree, and interfering with a police officer. Jose further was charged with assault on a police officer for spitting on the officer during the booking process. The same public defender was appointed to represent the defendant and Jose. After a joint trial, the defendant was convicted of all three charges. Thereafter, the court imposed on the defendant a total effective sentence of ten years imprisonment, execution suspended after five years, followed by five years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

We begin by addressing the defendant's claim that the court, *Devlin*, *J.*, violated his sixth amendment rights to conflict free representation by conducting an insufficient inquiry into the existence of a conflict of interest, as required by *Holloway* v. *Arkansas*, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978).[1] The state responds first that the court had no duty under *Holloway* to inquire into whether a conflict of interest existed in counsel's representation of the defendant because counsel never indicated that such a conflict might exist with respect to him. Alternatively, the state argues that even if *Holloway* applies, the court did not violate the defendant's constitutional rights because it conducted an adequate inquiry into the potential conflict raised by counsel and it reasonably concluded that the proffered conflict was too speculative to require the appointment of separate counsel for Jose. We conclude that the court's inquiry into the existence of a conflict of interest in the joint representation complied with the constitutional requirements of *Holloway* and that the court did not err by not appointing a special public defender to represent Jose.

The following additional facts are relevant to this claim. On March 29, 2013, a public defender was assigned to represent jointly the defendant and Jose. At four pretrial hearings for the defendant and Jose between August 6, 2013, and April 21, 2014, counsel represented to the court that there was presently no conflict of interest in the joint representation because the defendant and Jose's defenses were in concert. Additionally, at pretrial hearings on September 5 and November 4, 2013, the defendant and Jose rejected plea offers from the state.

At a pretrial proceeding on May 29, 2014, the final pretrial hearing before jury selection on June 2, 2014, the following colloquy took place between the court, *Devlin*, *J.*, and counsel when the defendant's case was called:

"[Defense Counsel]: I'd be asking for an appointment with a special public defender in [Jose's] case, Your Honor.

"The Court: No way. I mean the case goes back to—

it's over a year old. These guys are identical twins. You're asking for that now?

"[Defense Counsel]: Your Honor, as the case approaches trial my concern was that one of them could get—could be interested in pleading and—

"The Court: Your job is to evaluate this in the first thirty days of your representation.

"[Defense Counsel]: Yes, Your Honor. I was anticipating the possibility of some resolution at some point during the pretrial process but it doesn't appear that that's going to be the case.

"The Court: Well, look, Francisco Navarro, you report tomorrow to Judge Kavanewsky to start jury selection on this case tomorrow, right, because *I assume your client is turning down the proposed disposition on this case*?

"[Defense Counsel]: *He does not want the ten suspended after five with three probation.*

"The Court: Okay. So, we're going to start trial tomorrow, Mr. Navarro." (Emphasis added.)

Immediately thereafter, the court called Jose's case and engaged in the following colloquy with counsel:

"[Defense Counsel]: This is the case where I had intended to ask for a special public defender, Your Honor.

"The Court: And what's the basis for that?

"[Defense Counsel]: I think there is *some possibility of a conflict should* Francisco Navarro change his mind about entering a plea in this matter, Your Honor, and that would put me in a difficult situation, ethically.

"The Court: I'm not following. You need to give me more specific reasons than that.

"[Defense Counsel]: Well, the defense does appear to be in concert, Your Honor. Should Mr. Navarro change his mind about pleading—

"The Court: Which one, Mr. Francisco—

"[Defense Counsel]: Oh, Francisco. My apologies, Your Honor. The codefendant was just before Your Honor. *Should* he change his mind and during the allocution process, he *might* have to admit to facts which *could potentially* inculpate Jose Navarro.

"The Court: Right. *But Francisco is not admitting to anything. He's going to trial.*

"[Defense Counsel]: *That's correct, Your Honor.*

"The Court: And so, Jose is going to trial as well, right? *On their present record, both of these gentlemen,* which is their perfect right, *do not want to resolve the case and wish to go to trial. Is that true or not true*?

"[Defense Counsel]: *That's correct*, Your Honor.

"The Court: Okay. So, my concern is that it looks like these people were arrested on or about, you know, May 29, 2013. We're now May 29th—exactly one year ago, they were arrested. It's unreasonable to having this case been on the firm jury docket thirteen times, however many times on the pretrial docket, literally the day—twenty-four hours before their trial is supposed to start a lawyer represents these two defendants simultaneously for a full year, now, wants a new lawyer and just on some speculation.[2] Okay, Jose Navarro's case is also put down for trial tomorrow morning, in front of Judge Kavanewsky." (Emphasis added; footnote added.)

We begin by setting forth the legal principles that govern our analysis. "It is well established that the sixth amendment to the United States constitution guarantees the right to effective assistance of counsel. . . . Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest. . . . This right requires that the assistance of counsel be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." (Citations omitted; internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 386, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002). To safeguard a criminal defendant's right to effective assistance of counsel, *Holloway* imposes "an affirmative obligation [on trial courts] to explore the possibility of conflict when such conflict is brought to the attention of the trial judge in a timely manner. . . . The course thereafter followed by the court in its inquiry depends upon the circumstances of the particular case." (Citations omitted; internal quotation marks omitted.) Id, 389.

If "a trial court improperly requires joint representation over timely objection," then "reversal is automatic." *Holloway* v. *Arkansas*, supra, 435 U.S. 488. If, however, the court determines that the possibility of a conflict of interest is "too remote to warrant separate counsel"; id., 484; the court may deny counsel's request for separate counsel. See id. This is because "[i]t is not representation of more than one client which deprives a defendant of his constitutional right to effective assistance of counsel, it is representation of *clients with adverse interests*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Cator*, 256 Conn. 785, 794, 781 A.2d 285 (2001); see also *Cuyler* v. *Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980) ("*Holloway* reaffirmed that multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest"); *Holloway* v. *Arkansas*, supra, 482 ("[r]equiring or permitting a single attorney to represent codefendants . . . is not *per se* violative

of constitutional guarantees of effective assistance of counsel" [emphasis in original]).

When counsel informed the court of his concern that a conflict of interest might arise if the defendant decided to plead guilty, the court's duty to inquire under *Holloway* was triggered. Based on the particular circumstances in this case, however, we conclude that the court conducted an adequate inquiry into the proffered conflict of interest and did not err in determining that the conflict was too speculative to require the appointment of separate counsel for Jose.

When Jose's case was called, the court immediately asked counsel to articulate the basis for his request for a special public defender for Jose.[3] Counsel indicated that "there is *some possibility of a conflict should* Francisco Navarro change his mind about entering a plea in this matter, Your Honor, and that would put me in a difficult situation, ethically." (Emphasis added.) Given the vague nature of counsel's representation, the court reasonably asked for a more specific reason for his request. Counsel, however, did not articulate why an *actual* conflict of interest existed or was likely to emerge. Instead, counsel repeated his supposition that "*should* [Francisco] change his mind and during the allocution process, he *might have to* admit to facts *which could potentially* inculpate Jose Navarro." (Emphasis added.) When the court asked counsel whether the defendant wanted to resolve the case or go to trial, counsel represented, as he had during the defendant's pretrial hearing, that the defendant wanted to go to trial. On the basis of counsel's representation, the court reasonably concluded that the conflict of interest identified by counsel was speculative and too remote to require the appointment of separate counsel for Jose. See *Mickens* v. *Taylor*, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002) ("we think 'an actual conflict of interest' [means] precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties" [emphasis in original]).

The defendant nevertheless raises several issues concerning the substance of the court's inquiry. The defendant first argues that the court improperly focused on the timing of counsel's request rather than on the nature of the potential conflict. We disagree. Although the court expressed its consternation at the untimely nature of counsel's request for substitute counsel for Jose during the defendant's hearing, the court clearly afforded counsel an opportunity during Jose's hearing to explain why substitute counsel was necessary. Counsel stated that there was a potential for a conflict of interest should the defendant plead guilty, but he was unable to explain why this event was not too remote to require the appointment of separate counsel.

The defendant also argues that the court's inquiry

was inadequate because it "ignored the obvious—that [the] Defendant was suddenly willing to inculpate Jose in return for a more favorable disposition." Similarly, the defendant argues that the court's inquiry was inadequate because the court did not recognize the risk that the defendant or Jose might decide to testify at trial in a manner that was adverse to the interests of the other. Contrary to the defendant's repeated assertions, it was not "obvious" at the May 29 hearing that he was interested in cooperating with the state in exchange for a favorable plea agreement. Counsel never represented to the court that the defendant was interested in cooperating with the state against Jose or that his concurrent representation of the defendant and Jose was inhibiting his ability to negotiate a favorable plea deal for the defendant. Nor did counsel represent to the court that he was concerned that one defendant might testify in an adverse manner at trial.

We reiterate that "*Holloway* [requires] an inquiry only when 'the trial court knows or reasonably should know that a *particular* conflict exists.' . . ." (Emphasis added.) *Mickens* v. *Taylor*, supra, 535 U.S. 168. It does not require the trial court to inquire into the existence of "a vague, unspecified possibility of conflict, such as that which inheres in almost every instance of multiple representation." (Internal quotation marks omitted.) Id., 169. "It is firmly established that a trial court is entitled to rely on the silence of the defendant and his attorney, even in the absence of inquiry, when evaluating whether a potential conflict of interest exists. . . . [D]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent *special circumstances*, therefore, trial courts may assume either that [the potentially conflicted] representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Gaines*, 257 Conn. 695, 708, 778 A.2d 919 (2001). Because the potential conflicts identified by the defendant on appeal exist in almost every instance of joint representation and counsel never expressed concerns about them manifesting in the defendant's case, the court was not required to inquire about them. See *State* v. *Crespo*, 246 Conn. 665, 697, 718 A.2d 925 (1998) ("A trial judge cannot be expected to be prescient. . . . Before the trial court is charged with a duty to inquire, the evidence of a specific conflict must be sufficient to alert a reasonable trial judge that the defendant's sixth amendment right to effective assistance of counsel is in jeopardy."), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

Therefore, we conclude that the court complied with its obligations under *Holloway* at the May 29, 2014 pretrial hearing.

## II

The defendant next claims that counsel rendered ineffective assistance because counsel was burdened by an actual conflict of interest that adversely affected his performance during plea negotiations, trial, and sentencing. The state responds that the defendant waived his right to conflict free representation and, alternatively, that the record is insufficient to review his claim on the merits. We agree with both of the state's arguments.

The following additional facts are relevant to this claim. On May 30, 2014, the parties met with the court, *Kavanewsky, J.*, in chambers to discuss the issue raised by counsel the day before. On June 2, 2014, the parties next appeared in court. The court engaged in the following colloquy with counsel:

"The Court: Okay. Now we have discussed this case before today and I know that before the case came here Judge Devlin was over at the [courthouse at geographical area number two] and had some discussion with counsel concerning this case. It's my understanding that counsel had continuously represented both defendants in this case.

"[Defense Counsel]: That is correct, Your Honor.

"The Court: Okay. And while there may have been some suggestion to Judge Devlin that a motion might be filed, because I want the record to be clear here, regarding the special public defender for one defendant. I don't know what was said on the record and what was not but when the case came to me and we had the same discussion, *counsel indicated that he had no intention whatsoever of filing such a motion and did not think it was warranted.* Do I have that—

"[Defense Counsel]: *That's correct, Your Honor.*

"The Court: Okay. And have your clients been kept abreast of all of this as we've gone along and as you've gone along?

"[Defense Counsel]: They have, Your Honor. And Your Honor in chambers on Friday [May 30, 2014] had indicated your intention to canvass them regarding the potential conflict. I did discuss that with them and prepared them for that canvass.

"The Court: Okay. And I am going to question them but before I do, is it your understanding that . . . both defendants waive any potential conflict and wish you to represent them in this matter?

"[Defense Counsel]: That is my under—

"The Court: Is that your understanding?

"[Defense Counsel]: That is my understanding, Your Honor.

"The Court: Okay. For the record, I previewed the evidence with the state and with defense counsel and, based on that preview, there was nothing that leapt out to me that in my mind would require the appointment of a special public defender for one of the two defendants. There did not seem to be any actual or potential conflict. However, I do want to canvass each defendant individually briefly concerning this matter and make sure we're on the same page so to speak." (Emphasis added.)

The court first canvassed Jose concerning his rights and the types of conflicts of interest that might arise from joint representation. The court then engaged in the following colloquy with the defendant:

"The Court: Okay. And you've been present during what's been said so far today?

"[The Defendant]: Yes, sir.

"The Court: Okay.

"The Court: And do you have an understanding of what's been said?

"[The Defendant]: Yes, sir.

"The Court: Okay. I have to ask you the same questions even though you've heard them already. What I'm trying to do is satisfy that you understand that should there be any conflicts that you have made an intelligent waiver of your choice to allow counsel to represent both you and your brother. Do you understand that?

"[The Defendant]: Yes, sir.

"The Court: All right. So some examples again are *whether or not to accept or reject a plea offer to one defendant conditioned on the defendant testifying against the other, whether or not to present a defense that helps one defendant more than the other, whether or not to cross-examine a witness whose testimony may help one defendant or hurt the other*, whether to have one defendant testify while the other exercises his right to remain silent. Although as I said before, the decision to testify is a right that's personal to the defendant, that's his choice not his counsel's choice, whether or not to emphasize in summation that certain evidence is admitted only against or is less compelling against one defendant than the other.

"And last, should we come to the point of a sentencing, *whether or not to argue at sentencing that one defendant's role in the criminal activity was shown to be or was arguably subordinate or less—well, it was more minimal than the other defendant's role.* Do you understand those are all situations that could arise during the course of a trial and your attorney who is representing your brother would be confronted with those choices, you understand that?

"[The Defendant]: Yes, sir.

"The Court: Okay. I want to make sure that you have been advised of your right to effective representation, and that you understand the details of your attorney's possible conflicts of interest and potential perils of such conflicts that you've discussed the matter with your attorney, or if you had so desired discussed it with outside counsel and that you voluntarily waive any . . . Sixth Amendment protections or conflict-free representation, do you understand that?

"[The Defendant]: Yes, sir.

"The Court: Okay. So again, what I am going to do is—do you have any questions of me right now? Do you have any questions to ask me about what I've said?

"[The Defendant]: No, Your Honor." (Emphasis added.)

The court then informed both defendants that they were going to take a brief recess, during which they could consult further with counsel, and afterwards it would ask them individually whether they wanted to proceed with counsel as their attorney. After the recess, the court received Jose's assurances that he wanted to waive his right to conflict free representation and to proceed with counsel representing him. The court then engaged in the following colloquy with the defendant:

"The Court: And Mr. Francisco Navarro, again you heard me go over it before, examples of *situations that might run the risk of your attorney having to favor or choose to favor one defendant more than the other and that's what I'm talking about when I say representations might not be conflict free.* Do you waive any potential for representation that might not be conflict free in this case?

"[The Defendant]: Yes, Your Honor.

"The Court: Okay. And do you wish [counsel] to represent you?

"[The Defendant]: Yes, Your Honor.

"The Court: Do you have any questions for him about that?

"[The Defendant]: No.

"The Court: Do you have any questions for me about that?

"[The Defendant]: No." (Emphasis added.)

After completing the defendant's canvass, the court directed the record to reflect "that both defendants were canvassed individually in open court concerning [counsel's] representing each defendant and each defendant has separately and knowingly and voluntarily and understandingly waived any potential for representation that may not be conflict free."

A

We first address the defendant's claim that a conflict of interest adversely affected counsel's performance during plea negotiations. The defendant argues first that his waiver at the June 2, 2014 hearing does not apply retroactively to his right to conflict free representation during plea negotiations. The defendant further claims that an actual conflict existed during plea negotiations and that conflict adversely affected counsel's performance. The state responds that the defendant waived his right to conflict free representation during the June 2 hearing. Alternatively, the state argues that the defendant's claim is unreviewable because the record is inadequate to determine whether the defendant waived his right to conflict free representation prior to the June 2 hearing and whether counsel labored under an actual conflict of interest that adversely affect his performance during plea negotiations. We conclude that the record is inadequate to review the defendant's claim on the merits, and, therefore, we need not address whether the defendant waived his right to conflict free representation during plea negotiations.

"Almost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim. . . . Moreover, we have stated as our preference that *all* of the claims of ineffective assistance, those arguably supported by the record as well as others requiring an evidentiary hearing, be evaluated by the same trier in the same proceeding. . . . On the rare occasions that we have addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the *trial court*, rather than by those of his counsel. . . . We have addressed such claims, moreover, only where the record of the trial court's allegedly improper action was adequate for review or the issue presented was a question of law, not one of fact requiring further evidentiary development. . . .

"In a case of a claimed [actual] conflict of interest . . . in order to establish a violation of the sixth amendment the defendant has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance. . . . We have described an attorney's conflict of interest as that which impedes his paramount duty of loyalty to his client. . . . Thus, an attorney may be considered to be laboring under an impaired duty of loyalty, and thereby be subject to conflicting interests, because of interests or factors personal to him that are inconsistent, diverse or otherwise discordant with [the interests] of his client . . . ." (Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) *State*

v. *Crespo*, supra, 246 Conn. 687–90; see also *Cuyler* v. *Sullivan*, supra, 446 U.S. 350 ("the *possibility* of conflict is insufficient to impugn a criminal conviction" [emphasis added]).

The record before us is inadequate to determine whether counsel labored under a conflict of interest during plea negotiations. The defendant contends that plea negotiations always create a conflict of interest in cases where defendants are jointly represented because the joint representation prevents counsel from arguing that one defendant should be given "a break" because of certain mitigating factors or from negotiating a plea deal that would require one client to implicate or testify against another. Although the defendant correctly identifies several *potential* conflicts that might arise during plea negotiations for jointly represented defendants, to prevail in his claim the defendant must establish that an *actual* conflict of interest arose during plea negotiations. The record demonstrates only that the defendant was offered two plea deals and that he rejected both. It does not reflect what transpired during plea negotiations. Nor does it reflect what counsel and the defendant discussed prior to or during plea negotiations. As a result, we do not know whether counsel argued that the defendant was more entitled to "a break" than Jose or whether the defendant told counsel that he would not accept a plea deal that required him to testify against his brother.

"Accordingly, we shall not review at this time . . . the defendant's ineffective assistance [claim] that he contends [is] adequately supported by the record. . . . [W]e believe that his ineffective assistance [claim] should be resolved . . . after an evidentiary hearing in the trial court where the attorney whose conduct is in question may have an opportunity to testify." (Internal quotation marks omitted.) *State* v. *Taft*, 306 Conn. 749, 769, 51 A.3d 988 (2012); see also *State* v. *Daly*, 111 Conn. App. 397, 400, 960 A.2d 1040 (2008) ("it is well established that as an appellate tribunal, we do not find facts") cert. denied, 292 Conn. 909, 973 A.2d 108 (2009).

B

Finally, the defendant claims that a conflict of interest adversely affected counsel's performance at trial and sentencing. With respect to trial, the defendant claims that the joint representation prevented counsel from effectively cross-examining Jose. With respect to sentencing, the defendant claims that the joint representation prevented counsel from effectively arguing that he was entitled to a lesser sentence than Jose was. The state responds that the defendant waived his right to conflict free representation at trial and sentencing at the June 2, 2014 hearing. Alternatively, the state argues that the record is inadequate to review these claims on the merits. We agree with the state.

The following additional facts are relevant to this claim. At trial, Jose elected to testify on his own behalf, but his testimony was limited to his arrest and booking. During that testimony, Jose mentioned that he was wearing "pajama pants" with "flip flops" on the night in question, May 29, 2013.

We conclude that the defendant knowingly and voluntarily waived his right to conflict free representation at trial and sentencing at the June 2 hearing. "Just as the right to assistance of counsel may be waived in favor of self-representation . . . so may a defendant waive the right to conflict-free representation" so long as the trial court determines "on the record that such a waiver is knowing and intelligent." (Citations omitted.) *State* v. *Williams*, 203 Conn. 159, 167, 523 A.2d 1284 (1987). "If the defendant reveals that he is aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the basis of this information, and if he states clearly and unequivocally . . . that he nevertheless chooses to hazard [the] dangers of waiving conflict-free representation, then his waiver may appropriately be accepted. . . . The waiver is not vitiated simply because the defendant, with the benefit of hindsight, might have chosen differently. A defendant need not be prescient in order to waive knowingly and intelligently the right to conflict-free representation." (Citations omitted; internal quotation marks omitted.) Id., 167–68.

At the June 2 hearing, the court canvassed the defendant concerning his waiver of his right to conflict free representation. As part of that canvass, the court provided the defendant with several examples of the types of conflicts that might arise at trial and sentencing and cautioned the defendant that by continuing with joint representation "[you] run the risk of your attorney having to favor or choose to favor one defendant more than the other." The defendant, after being given an opportunity to consult further with counsel and to ask the court questions concerning his rights and waiver, confirmed that he wanted to waive any potential conflict of interest that might arise from the joint representation and that he wanted counsel to continue to represent him.

The defendant now argues that this waiver was not knowing and intelligent because the court (1) improperly remarked that it did not believe, after previewing the state's evidence, that a conflict of interest existed and (2) never explained what it meant to consult with "outside counsel." We disagree. We are not persuaded that the court's frank assessment of the conflict situation prevented the defendant from understanding the risks associated with joint representation. The court acknowledged when speaking to the defendant that a conflict of interest could exist "although I'm not seeing it here." The court also conducted a thorough and infor-

mative canvass that explored a variety of conflicts that might arise before, during, and after a trial. The defendant never indicated that he did not understand the court's advisement or the import of his waiver. For these same reasons, we cannot conclude that the court's failure to explain further the term "outside counsel" prevented the defendant from understanding the risks associated with joint representation. Accordingly, because the defendant waived his right to conflict free representation, he cannot claim that counsel rendered ineffective assistance by laboring under a conflict at trial or sentencing.

Nevertheless, even if we were to assume for the sake of argument that the defendant did not waive his right to conflict free representation at trial and sentencing, his claims are unreviewable. The defendant first argues that counsel was ineffective for not eliciting testimony from Jose that he and the defendant were not involved in the attempted burglary or threatening of the victims and for not cross-examining Jose concerning his assertion that he was wearing flip-flops during the booking process. The defendant appears to argue that by not soliciting testimony from Jose that he and the defendant were not involved in the attempted burglary, counsel permitted Jose implicitly to admit that they were involved in the incident. Additionally, the defendant appears to argue that by permitting Jose to testify unchallenged that he was wearing flip-flops, counsel permitted Jose to testify that "he [Jose], unlike Francisco, should be ruled out as trying to kick down the back door of Kenney's rooming house."[4]

The defendant also argues that counsel was ineffective for not highlighting at his sentencing certain factors that would have painted him in a more sympathetic light than Jose and would have supported an argument for a lesser sentence. For example, he believes that the joint representation prevented counsel from emphasizing that, unlike Jose, he suffered from a traumatic brain injury, which impaired his cognitive abilities,[5] and had no prior convictions for assault on a police officer.[6]

Contrary to the defendant's assertion, we cannot conclude from this record that counsel's actions at trial and sentencing were the product of an impaired duty of loyalty. The decision not to question Jose about the attempted burglary or his footwear may have been based on counsel's ethical obligations; see Rule 3.3 of the Rules of Professional Conduct;[7] or part of a reasonable trial strategy, properly discussed with and agreed to by the defendant. Similarly, the decision not to highlight the factors identified by the defendant at the sentencing hearing might also have been part of a reasonable sentencing strategy on the part of counsel. Accordingly, we decline to review the defendant's ineffective assistance claims.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also appears to raise a due process claim. In his statement of the issues, the defendant alleges a due process violation. Similarly, when addressing the reviewability of his claim, the defendant argued that the court committed a " 'due process' error" by failing to conduct a sufficient inquiry into the existence of a conflict of interest and that, therefore, the case should be remanded for further proceedings. See *Wood* v. *Georgia*, 450 U.S. 261, 272–74, 272, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981) (case remanded sua sponte with instructions for determination of whether conflict of interest of employees' counsel, who also represented employer, existed at probation revocation hearing such as to constitute violation of employees' due process rights). The defendant did not subsequently analyze, however, the relationship between the law cited and the facts of his case. Instead, the defendant's analysis identifies this claim as a "*Holloway* claim" and focuses exclusively on sixth amendment jurisprudence. Accordingly, we decline to review the defendant's due process claim because it was briefed inadequately. See *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016).

[2] The court misspoke when it indicated that jury selection commenced the next day, i.e., Friday, May 30, 2014. Instead, jury selection commenced the following Monday, i.e., Monday, June 2, 2014.

[3] The defendant takes issue with the fact that the court did not address the conflict issue during his pretrial hearing. The defendant overlooks the fact that counsel did not alert the court to the potential conflict of interest until Jose's case was called. When the court became aware of the potential conflict issue, it immediately conducted an inquiry into whether a conflict of interest had arisen or was likely to arise in the joint representation.

[4] As we previously stated, Kenney also identified the defendant as the individual who attempted to kick in the back door.

[5] We observe that at the sentencing hearing, counsel observed how the defendant was victimized in an accident that "left him with some physical difficulties" and how he continues to attempt to find work despite those difficulties. Additionally, although the defendant's presentence investigation report is not part of the record before us, at the sentencing hearing, the court observed that the presentence investigation report discussed the attack that caused the defendant's traumatic brain injury and other medical issues.

[6] We observe that although the defendant does not have prior convictions for assault on a police officer, he has several prior convictions, including convictions for breach of peace, threatening in the second degree, and violation of a protective order.

[7] Rule 3.3 of the Rules of Professional Conduct states in relevant part: "(a) A lawyer shall not knowingly  . . . (3) Offer evidence that the lawyer knows to be false. . . ."