******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROGEAU R. COLLINS *v.* COMMISSIONER
OF CORRECTION
(AC 42785)

Lavine, Suarez and Devlin, Js.*

*Syllabus*

The petitioner, who had been convicted of felony murder and robbery in the first degree, sought a writ of habeas corpus, claiming that his right to conflict free counsel was violated and that his trial counsel provided ineffective assistance. Specifically, the petitioner claimed that his trial counsel had a financial incentive not to retain three expert witnesses and that he failed to investigate a potential eyewitness and present her testimony. The habeas court rendered judgment denying the habeas petition, and the petitioner, on the granting of certification, appealed to this court. *Held:*

1. The petitioner could not prevail on his claim that the habeas court erred in concluding that his trial counsel did not have a conflict of interest:

   a. This court concluded, contrary to the determination of the habeas court, that the petitioner's conflict of interest claim was not procedurally defaulted, as it was a type of ineffective assistance of counsel claim that typically must be raised by way of habeas corpus, rather than by direct appeal, due to the need for a full evidentiary record of the claim; neither trial counsel nor the court raised the potential for a conflict of interest at trial and, consequently, the record on direct appeal was not adequate to review the claim; accordingly, the claim was not subject to the procedural default doctrine.

   b. The habeas court properly determined that no actual conflict of interest existed because trial counsel did not have an obligation to finance the petitioner's litigation costs or to make his private resources available to the petitioner: the fee agreement clearly placed responsibility for the payment of experts on the petitioner and his family, and counsel's decision not to advance funds to engage experts after the family failed to do so did not violate his duty of loyalty or otherwise create a conflict of interest.

2. The habeas court did not err in determining that the petitioner was not denied his constitutional right to the effective assistance of trial counsel, reasoning that trial counsel's failure to investigate the potential eyewitness did not result in any prejudice to the petitioner's defense: the habeas court's conclusion that the witness would not have been willing to assist the defense at trial, even if she had been contacted by counsel, was based on a credibility determination that was not clearly erroneous even though the witness stated at the habeas trial that she would have testified at the trial if she had been approached by counsel because she also testified that she witnessed the shooting, knew that the petitioner had been arrested, and yet made no efforts to contact the police; accordingly, the petitioner did not establish that there was a reasonable probability that the trial outcome would have been different if trial counsel had investigated the eyewitness.

Argued October 13, 2020—officially released February 23, 2021

*Procedural History*

Second amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Kwak, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Jennifer B. Smith*, for the appellant (petitioner).

*Timothy F. Costello*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, former

state's attorney, and *Tamara Grosso*, assistant state's attorney, for the appellee (respondent).

*Opinion*

DEVLIN, J. The petitioner, Rogeau R. Collins, appeals from the judgment of the habeas court, *Kwak, J.*, denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly (1) determined that his conflict of interest claim was procedurally defaulted and that, in any event, his trial counsel did not have a conflict of interest and (2) denied his ineffective assistance of counsel claim. We affirm the judgment of the habeas court.

The following recitation of facts was set forth by this court in the petitioner's direct appeal from his conviction. "In March, 2009, Robert Dixon, the victim, resided in Hartford with his girlfriend. Dixon always carried two cell phones. He used one cell phone to sell drugs and the other for personal matters. In addition, he always wore an expensive pair of Cartier glasses. He did not store the drugs he sold at his home, but kept them at a remote location secured in a safe. The key to the safe was on the same key ring as Dixon's car keys.

"On March 9, 2009, Dixon exchanged several phone calls with an individual named Adrian Dean, a friend of the [petitioner]. At approximately 9:25 p.m. that night, Dixon left his residence in his vehicle carrying both of his cell phones and wearing his Cartier glasses. Sometime thereafter, Dean joined Dixon in the vehicle. Dean then contacted the [petitioner], who was driving around the Hartford area in his girlfriend's vehicle. Dean arranged to meet the [petitioner] at a location in Bloomfield and gave the [petitioner] directions to that location. The [petitioner] followed Dean's directions and arrived at the location at approximately the same time as Dean and Dixon. Dixon and the [petitioner] then drove their vehicles toward a cul-de-sac at the end of the road. Dixon turned his vehicle in the cul-de-sac and came to a stop. The [petitioner] pulled up and stopped his vehicle to the left of Dixon's vehicle. The [petitioner] then exited his vehicle. Both the [petitioner] and Dean, who had exited Dixon's vehicle, approached the driver's side door of Dixon's vehicle. Dixon was still sitting in the driver's seat of his vehicle. Dean, with a firearm in one of his hands, opened the driver's side door of Dixon's vehicle and shot Dixon in the head. Dean then asked the [petitioner] to search Dixon's pockets. The [petitioner] began patting Dixon's pockets when Dixon flinched and attempted to escape the vehicle through the passenger side door. Dixon was shot seven times as he attempted to escape and died as a result of the multiple gunshot wounds. The [petitioner] and Dean then left the scene in the [petitioner's] vehicle. The following morning, on March 10, 2009, Dixon was found dead by two fishermen. Dixon's two cell phones, Cartier glasses, and keys were not found at the scene. The [petitioner] was arrested on March 24, 2009.

"The state, in a long form information filed on January 11, 2011, charged the [petitioner] with murder in violation of General Statutes § 53a-54a (a), felony murder in violation of [General Statutes] § 53a-54c, conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a), robbery in the first degree in violation of [General Statutes] § 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a) (2). The jury found the [petitioner] guilty of felony murder and robbery in the first degree, but not guilty [of] each of the remaining charges. The court sentenced the [petitioner] to a total effective term of forty-five years of imprisonment." *State* v. *Collins*, 147 Conn. App. 584, 586–88, 82 A.3d 1208, cert. denied, 311 Conn. 921, 86 A.3d 1057 (2014). This court affirmed the trial court's judgment on appeal. Id., 598.

On March 23, 2015, the self-represented petitioner filed a petition for a writ of habeas corpus. The petitioner filed an amended petition with the assistance of counsel on February 14, 2018, which was again amended on April 10, 2018. The second amended petition contained four counts, only two of which are relevant to this appeal.[1] In the first count, the petitioner alleged that his trial counsel, Aaron Romano, had a conflict of interest and, thus, rendered ineffective assistance. In the second count, the petitioner alleged that Romano was ineffective for failing to investigate and present a potentially exculpatory witness to the robbery, Teara Rosario, and that such failure materially prejudiced the petitioner's case.[2]

A trial on the habeas petition was held on June 8 and 12, 2018. On December 28, 2018, the habeas court issued a memorandum of decision in which it denied each of the petitioner's claims. Specifically, as to the first count, the court concluded that the petitioner's conflict of interest claim was procedurally defaulted and that, even if it were not, the petitioner had failed to demonstrate that Romano had a conflict of interest. As to the second count, the court agreed with the petitioner that Romano was ineffective in not investigating the potentially exculpatory witness but also found that "it would be too speculative to assess whether the absence of [the witness'] testimony at the criminal trial inured to the petitioner's prejudice." Thereafter, the petitioner filed a petition for certification to appeal from the judgment denying his petition for a writ of habeas corpus. The habeas court granted the petition for certification to appeal. Additional facts will be set forth as necessary.

Before we turn to the petitioner's claims, we briefly set forth our standard of review for habeas corpus appeals. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events

and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012).

I

The petitioner first claims that the habeas court erred in concluding that his conflict of interest claim was procedurally defaulted and that, even if it were not, Romano did not have an actual conflict of interest that rendered his representation ineffective. Although we agree that the petitioner's claim was not procedurally defaulted, we also agree with the habeas court's conclusion that Romano did not have a conflict of interest.

The following additional facts are relevant to our resolution of this claim. After he was arrested, the petitioner was found to be indigent and initially a special public defender was appointed for him. The petitioner's family retained Romano on February 27, 2010, to represent the petitioner in lieu of a special public defender. The petitioner's father signed a representation agreement, agreeing to pay Romano a retainer of $25,000, which included the trial fee, should the case proceed to trial. The father also agreed that, "[i]f in the opinion of [counsel], the services of experts or private investigators or the acquisition of medical, police, or other investigatory reports are necessary in defending [the petitioner] in the abovementioned matter, I agree to pay the additional costs and fees that may arise as a result of securing these services."

On March 10, 2010, Romano filed a motion for expenses pursuant to *Ake* v. *Oklahoma*, 470 U.S. 68, 87, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985),[3] arguing that the petitioner was indigent and that state funding of expert witnesses was necessary in order to provide effective assistance of counsel. Specifically, Romano claimed that he needed a ballistics expert to challenge the state's firearms expert, a cell phone expert to challenge the state's cell phone expert, a psychologist or psychiatrist to opine on the voluntariness of the petitioner's statements, and an independent medical examiner to determine the trajectory of the bullets. The court, *Mullarkey, J.*, conducted an evidentiary hearing over the course of three days. Ultimately, the court denied the request for expenses, concluding that Romano had failed to make a sufficiently particularized showing of need for the experts and that the petitioner's indigency was voluntary.[4] The court explained that, because the petitioner's family had decided to retain and pay Romano, the petitioner was voluntarily indigent. The court recom-

mended that Romano pay for experts to review the case using funds he already had received and consult with the state's experts, such as the state medical examiner, before deciding if independent experts were necessary. Additionally, before adjourning, the court specifically instructed the petitioner that "the state will pay for all experts that the Chief Public Defender's office determines are necessary if you're represented by the public defender."

Prior to trial, on January 19, 2011, Romano filed an amended motion for expenses, arguing again that the petitioner was indigent and that experts were absolutely necessary to his defense. After a hearing on the motion held on February 8, 2011, the court, *Espinosa, J.*, denied the motion, finding that "[t]he [petitioner] had access to a special public defender, with all of the advantages and resources that the Office of the Public Defender could provide. The [petitioner] knowingly and wilfully rejected those services by having a private counsel file an appearance in this case." The court also recommended that Romano consider spending a portion of the fee that he received on experts and then subsequently seek reimbursement from the petitioner's family, pursuant to the provision in the retainer agreement.

On February 8, 2011, the petitioner moved to suppress his statements made to the police, arguing that the statements were tainted, as they were obtained as the result of an arrest made without probable cause, and were involuntary. Romano presented no expert testimony to support the argument, nor did he argue specifically that the petitioner's cognitive deficiencies affected the voluntariness of the statements. The court denied the motion, finding that the statements were made knowingly and voluntarily. The introduction of evidence at trial began on March 15, 2011. Romano did not present any expert witnesses at trial.

A

The petitioner argues that the habeas court's determination that his conflict of interest claim was procedurally defaulted because he did not raise the claim at trial or on direct appeal was improper. We agree with the petitioner.

A habeas court's conclusion that a petitioner's claim was in procedural default involves a question of law, over which our review is plenary. *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 566, 941 A.2d 248 (2008).

We begin with a review of the procedural default rule. "Under the procedural default doctrine, a [petitioner] may not raise, in a collateral proceeding, claims that he could have made at trial or on direct appeal in the original proceeding, unless he can prove that his default by failure to do so should be excused." (Internal quotation marks omitted.) *Cator* v. *Commissioner of*

*Correction*, 181 Conn. App. 167, 199, 185 A.3d 601, cert. denied, 329 Conn. 902, 184 A.3d 1214 (2018). Ordinarily, if the state "alleges that a [petitioner] should be procedurally defaulted from now making the claim, the [petitioner] bears the burden of demonstrating good cause for having failed to raise the claim directly, and he must show that he suffered actual prejudice as a result of this excusable failure." *Hinds* v. *Commissioner of Correction*, 151 Conn. App. 837, 852, 97 A.3d 986 (2014), aff'd, 321 Conn. 56, 136 A.3d 596 (2016). This cause and prejudice test derives from *Wainwright* v. *Sykes*, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977), and was held by our Supreme Court to be "the appropriate standard for reviewability in a habeas corpus proceeding of constitutional claims not adequately preserved at trial because of a procedural default . . . ." *Johnson* v. *Commissioner of Correction*, 218 Conn. 403, 409, 589 A.2d 1214 (1991); see also *Jackson* v. *Commissioner of Correction*, 227 Conn. 124, 132, 629 A.2d 413 (1993) (holding that "the *Wainwright* cause and prejudice standard should be employed to determine the reviewability of habeas claims that were not properly pursued on direct appeal"). The procedural default doctrine, however, is limited to claims that *could* have been raised at the trial level. See *Hinds* v. *Commissioner of Correction*, supra, 853.

Conflict of interest claims are a species of ineffective assistance of counsel claims. See *Santiago* v. *Commissioner of Correction*, 87 Conn. App. 568, 582, 867 A.2d 70, cert. denied, 273 Conn. 930, 873 A.2d 997 (2005) ("[w]here a constitutional right to counsel exists, our [s]ixth [a]mendment cases hold that there is a correlative right to representation that is free from conflicts of interest"). Our Supreme Court has explained that ineffective assistance of counsel claims are generally more appropriately resolved on collateral review: "Almost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim. . . . Moreover, we have stated as our preference that *all* of the claims of ineffective assistance, those arguably supported by the record as well as others requiring an evidentiary hearing, be evaluated by the same trier in the same proceeding. . . . On the rare occasions that we have addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the *trial court*,[5] rather than by those of his counsel. . . . We have addressed such claims, moreover, only where the record of the trial court's allegedly improper action was adequate for review or the issue presented was a question of law, not one of fact requiring further evidentiary development." (Citations omitted; emphasis in original; footnote added; internal quo-

tation marks omitted.) *State* v. *Crespo*, 246 Conn. 665, 687–88, 718 A.2d 925 (1998) (declining to review conflict of interest claim on direct appeal), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

In *State* v. *Navarro*, 172 Conn. App. 472, 474, 160 A.3d 1116, cert. denied, 326 Conn. 910, 164 A.3d 681 (2017), this court examined a conflict of interest claim predicated on dual representation. In declining to review the claim on direct appeal, this court stated that the defendant's "ineffective assistance [claim] should be resolved . . . after an evidentiary hearing in the trial court where the attorney whose conduct is in question may have an opportunity to testify." (Internal quotation marks omitted.) Id., 491. The same need for testimony applies to the present case. Romano never raised the potential for a conflict of interest with the court, nor did the court raise the issue on its own. As such, it was not until the habeas trial itself that Romano explained on the record specifically *why* he declined to pay for experts using the retainer. Thus, we see no reason to depart from our Supreme Court's guidance that ineffective assistance of counsel claims are more appropriately resolved on collateral review. We conclude that the petitioner's conflict of interest claim is not subject to the procedural default doctrine and decline to apply the *Wainwright* cause and prejudice test, as the record on direct appeal was not adequate to review the claim.[6]

B

Having concluded that the petitioner's claim is not subject to procedural default, we proceed to consider the merits of his conflict of interest claim. The petitioner argues that Romano had an actual conflict of interest "because he had a personal financial incentive to not retain and present the testimony of three experts once the trial court denied his motion for state funding for the cost of those experts."[7] We are not persuaded.

We begin by setting forth the general legal principles concerning conflicts of interest in the representation of criminal defendants. "It is well established that the sixth amendment to the United States constitution guarantees the right to effective assistance of counsel. . . . Where a constitutional right to counsel exists, our [s]ixth [a]mendment cases hold that there is a correlative right to representation that is free from conflicts of interest." (Citations omitted; internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 386, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).[8]

"In a case of a claimed conflict of interest . . . in order to establish a violation of the sixth amendment the defendant has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an *actual conflict of interest* adversely affected his lawyer's performance. . . . Where there is

an actual conflict of interest, prejudice is presumed because counsel [has] breach[ed] the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. . . . Accordingly, an ineffectiveness claim predicated on an actual conflict of interest is unlike other ineffectiveness claims in that the petitioner need not establish actual prejudice." (Emphasis in original; internal quotation marks omitted.) *Grover* v. *Commissioner of Correction*, 183 Conn. App. 804, 813, 194 A.3d 316, cert. denied, 330 Conn. 933, 194 A.3d 1196 (2018).

"*An actual conflict of interest is more than a theoretical conflict.* The United States Supreme Court has cautioned that the possibility of conflict is insufficient to impugn a criminal conviction. . . . A conflict is merely a potential conflict of interest if the interests of the defendant may place the attorney under inconsistent duties at some time in the future. . . . To demonstrate an actual conflict of interest, the petitioner must be able to point to specific instances in the record which suggest impairment or compromise of his interests for the benefit of another party." (Emphasis altered; internal quotation marks omitted.) *Tilus* v. *Commissioner of Correction*, 175 Conn. App. 336, 349–50, 167 A.3d 1136, cert. denied, 327 Conn. 962, 172 A.3d 800 (2017); see *Cuyler* v. *Sullivan*, 446 U.S. 335, 345–50, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). "Whether the circumstances of . . . counsel's representation, as found by the habeas court, amount to an actual conflict of interest is a question of law [over] which our review is plenary." *Shefelbine* v. *Commissioner of Correction*, 150 Conn. App. 182, 193, 90 A.3d 987 (2014).

The petitioner claims that Romano breached his duty of loyalty to him when Romano declined to use his retainer to pay expert witness fees. Specifically, in his brief, the petitioner states: "Here, counsel's representation of the petitioner was materially limited because he had a financial interest in not presenting the testimony of these experts because he would have had to use his retainer fee to pay for them. His financial interests were inconsistent with the petitioner's interests, who had an interest in challenging the state's evidence and mounting a defense to these serious charges by way of presentation of expert testimony on three important issues."

We can identify no Connecticut or federal authority holding that counsel's failure to apply funds from a retainer agreement to the hiring of expert witnesses creates a conflict of interest. This court previously has found no conflict of interest where a fee agreement provided for a fixed fee of $7500 for all work leading up to trial and payment of $250 an hour with a $5000 retainer once the case was placed on the trial list. See *Grover* v. *Commissioner of Correction*, supra, 183 Conn. App. 808, 814. The petitioner in *Grover* was

unable to pay the full trial retainer and, subsequently, accepted a plea agreement. Id., 809. In his habeas petition the petitioner claimed "that [counsel] had a financial incentive to convince the petitioner to accept a plea rather than proceed to trial due to the fact that the petitioner was unable to pay [counsel's] trial retainer in full." Id. This court declined to find a conflict of interest, explaining that "[w]e do not agree that the petitioner's inability to pay the outstanding balance of the trial retainer created such a conflict. According to the testimony of [counsel], which the habeas court credited in its entirety, although he was disappointed that the trial retainer had not been paid in full, [counsel] valued his professional reputation above any single fee. He testified that his advice throughout the pendency of the criminal case was based on his overall assessment of the facts and not the financial situation of the petitioner." Id., 814–15. Moreover, this court has also concluded that a $300,000 retainer for the entire representation, without regard to whether the case was resolved by plea agreement or trial, does not represent an actual conflict of interest. See *Shefelbine* v. *Commissioner of Correction*, supra, 150 Conn. App. 193.

Federal courts have rejected conflict of interest claims arising from fee agreements similar to the one in the present case. In *Williams* v. *Vasquez*, 817 F. Supp. 1443, 1472 (E.D. Cal. 1993), aff'd sub nom. *Williams* v. *Calderon*, 52 F.3d 1465 (9th Cir. 1995), cert. denied, 517 U.S. 1183, 116 S. Ct. 1588, 134 L. Ed. 2d 686 (1996), the petitioner claimed that his trial counsel had a conflict of interest because "he was placed in the position whereby he had to personally pay for ancillary defense services, or [forgo] the use of such services." (Internal quotation marks omitted.) Id. In rejecting this claim, the District Court for the Eastern District of California stated: "Although the [s]ixth [a]mendment guarantee of effective assistance of counsel includes the collateral right to counsel's undivided loyalty . . . counsel's duty of loyalty does not impose an ancillary obligation to personally finance his client's defense investigation and/or expert costs. In other words, no conflict of interest existed. Counsel's failure to financially support [the] [p]etitioner's defense does not constitute a violation of his duty of loyalty or of [the] [p]etitioner's [s]ixth [a]mendment right to effective assistance of counsel." (Citations omitted.) Id., 1473. In affirming the judgment of the District Court, the Court of Appeals for the Ninth Circuit observed: "The quality of such representation might well improve if counsel were to volunteer to place her private financial resources at [the] defendant's disposal. As the [D]istrict [C]ourt correctly noted, counsel is under no obligation to do so." *Williams* v. *Calderon*, 52 F.3d 1465, 1473 (9th Cir. 1995), cert. denied, 517 U.S. 1183, 116 S. Ct. 1588, 134 L. Ed. 2d 686 (1996).

In *Bonin* v. *Calderon*, 59 F.3d 815, 827 (9th Cir. 1995), the United States Court of Appeals for the Ninth Circuit

again considered a habeas petitioner's claim that his trial counsel had a conflict of interest because trial counsel's substitution as retained counsel deprived the defendant of state funded investigators and expert witnesses, thereby requiring counsel to pay for any investigators or experts out of his own pocket. In rejecting this claim, the court noted that "[t]his allegation of conflict is . . . inadequate under *Cuyler* [v. *Sullivan*, supra, 446 U.S. 335]. . . . [A]n assertion of conflict based on the fact that payment for any investigation or psychiatric services could have come from counsel's pocket [forcing] counsel to choose between [the client's] interests and his own . . . is the same theoretical conflict that exists . . . in any pro bono or underfunded appointment case. . . . While such arrangements create a theoretical conflict of interest, they do not typically create actual conflicts under *Cuyler*." (Citations omitted; internal quotation marks omitted.) Id.

In *United States* v. *Stitt*, 552 F.3d 345, 350 (4th Cir. 2008), cert. denied, 558 U.S. 831, 130 S. Ct. 65, 175 L. Ed. 2d 48 (2009), the petitioner argued that "under the financial agreement between him and [counsel], [counsel] was required to pay for all case-related expenses out of his own pocket and that [counsel], not wishing to incur the costs of an out-of-state investigator, thus declined to pursue any investigation [out of state]." However, the United States Court of Appeals for the Fourth Circuit noted that the District Court had made the express factual finding, to the contrary, that counsel "were paid flat fees for their services, with costs and expenses to be paid as they arose . . . . Petitioner's family agreed to raise the money for any additional costs and expenses." (Internal quotation marks omitted.) Id., 351. After determining that this finding was not clearly erroneous, the court concluded that a fee agreement where counsel is paid a flat fee and must seek additional costs and expenses from the petitioner's family did not represent an actual conflict. Id.

The petitioner in the present case asserts that *Williams*, *Bonin*, and *Stitt* are distinguishable because the written fee agreement in the present case allowed Romano to advance the funds for experts and then pursue legal action against the petitioner's family for reimbursement. The petitioner's effort to distinguish *Williams*, *Bonin*, and *Stitt* on the ground that Romano could bring an action for reimbursement is unpersuasive. The fact that there might be a theoretical path to reimbursement does not create a conflict of interest where otherwise one does not exist. Those cases stand for the proposition that trial counsel has no obligation to finance a defendant's litigation costs and, further, is under no obligation to put counsel's private resources at the defendant's disposal. Advancing funds for experts amounts to exactly that.

The petitioner relies heavily on *State* v. *Cheatham*, 296 Kan. 417, 292 P.3d 318 (2013), for the proposition that "[a] fee agreement creates a conflict of interest between a client and his attorney where the fee agreement pits the attorney's interest in getting paid against those of the client." In *Cheatham*, the Kansas Supreme Court addressed the propriety of a flat fee arrangement in a death penalty case and concluded that the agreement in that case did constitute a conflict of interest. Id., 453. However, the court stressed several key facts that differentiate *Cheatham* from the present case. First, counsel in *Cheatham* was not paid any fees before the trial and thus operated under the presumption that there was "little likelihood of any payment because [the defendant] was indigent, which [counsel] knew." Id. Indeed, by the time of collateral proceedings, counsel testified that he still was owed the $50,000 retainer. Id., 451. Second, "[counsel], a solo practitioner with a 'high volume' law practice requiring near daily court appearances, [had] little financial incentive to invest the significant time commitment a capital case requires." Id., 453–54. Additionally, we note that when counsel in *Cheatham* took the case he was aware that the defendant would not be able to pay for expenses or expert witnesses. Id., 422. Ultimately, the court in *Cheatham* characterized the representation as "[bearing] a greater resemblance to a personal hobby engaged in for diversion rather than an occupation that carried with it a responsibility for zealous advocacy." Id., 454. An unpaid flat fee agreement in a death penalty case that incentivizes an attorney to do no more than the minimum necessary to secure a fee rather than seek acquittal is far from the situation in the present case, in which a written fee agreement placed the responsibility to pay for experts and investigators squarely on the petitioner's family. We find *Cheatham* inapposite to the claimed conflict of interest in the present case.

Given that this court has declined to find a conflict of interest between a defendant and counsel in flat fee cases, consistent with our holdings in *Grover* and *Shefelbine* and the holdings in the federal case law cited herein, we conclude that Romano did not have an actual conflict of interest. The fee structure in the present case is essentially the same fee structure that was present in *Stitt*, for which the Court of Appeals for the Fourth Circuit concluded there was no actual conflict of interest. See *United States* v. *Stitt*, supra, 552 F.3d 351. Further, an actual conflict of interest is more than a theoretical conflict. The United States Supreme Court has cautioned that "the possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler* v. *Sullivan*, supra, 446 U.S. 350. A conflict is merely "a *potential* conflict of interest if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." (Emphasis in original; internal quotation marks omitted.) *Santiago* v. *Commissioner of*

*Correction*, supra, 87 Conn. App. 589. In the present case, there was a written fee agreement that clearly delineated the financial arrangement involved in Romano's representation of the petitioner. The responsibility to pay for experts and investigators was placed squarely on the petitioner and his family. When they defaulted on this obligation, counsel's decision not to advance funds for experts did not violate his duty of loyalty or otherwise create a conflict of interest.[9] We therefore cannot conclude that Romano had an actual conflict of interest.

Because we conclude that there was no actual conflict of interest between the petitioner and Romano, we do not reach the second prong of the conflict of interest analysis concerning whether the conflict of interest adversely affected counsel's performance.

## II

The petitioner next claims that the habeas court improperly concluded that he received effective assistance of counsel. Specifically, the petitioner claims that the habeas court correctly concluded that Romano's performance was deficient for failing to investigate a potential witness, but that the court erred in concluding that Romano's failure to investigate the witness and to present her testimony did not prejudice the petitioner's case. We do not agree.

The following additional facts are relevant to our resolution of this claim. The petitioner testified at the habeas trial that he did not have a gun with him on the night of the shooting and that Dean ordered him at gunpoint to participate in the robbery. He claimed that he was ordered to pat down the victim, but that he did not fire any shots. This testimony was contradicted by the ballistics evidence presented at the criminal trial, which suggested that there were bullets fired from two different guns based on distinctive ballistic markings. The petitioner contends that trial testimony from the potential witness could have corroborated his version of the events, namely, that he was acting under duress when he participated in the robbery.

The petitioner testified at the habeas trial that there was a woman, Rosario, in his car with him on the night of the murder who witnessed the shooting. At the time, he only knew the woman as "T." He explained that he saw the woman on the street that night and that, because he had not seen her in four years, she got into his car and joined him as they drove around Hartford. After his arrest, the petitioner explained to the police that he had picked up the woman earlier that night. He told the police that she rode in the backseat of the car to the location of the murder and was dropped off afterward on Mather Street in Hartford. He described the witness to the police as "half black and half Spanish with a funny nose and a big forehead" with "shoulder

length" hair and mentioned that she hangs out at a smoke shop on Mather Street, but he was not able to provide her name. It was not until the petitioner was incarcerated that he learned from another inmate that the witness' name is Teara Rosario.

The petitioner also testified at the habeas trial that he had told Romano to find "T" and that she lived on Marvin Street. Romano testified that he was aware of the description of the woman in the police report and that he and the petitioner had discussed the potential witness. He considered the woman to be a potential witness, but, due to the petitioner's vague description of her and lack of a name, he thought that it was doubtful that an investigator would be able to locate the woman. Romano testified at the habeas trial that he believed that hiring a private investigator to find Rosario was necessary and that he requested expenses to do so. After his motion for expenses was denied, Romano made no effort to locate the woman either personally or through a private investigator. After learning of the witness' name while he was incarcerated, the petitioner was able to hire a private investigator to locate Rosario for the habeas trial. Rosario testified at the habeas trial that she ran into the petitioner in Hartford on the evening of the shooting and got into his car. While she was driving around with the petitioner, he received a "chirp" from Dean on his push-to-talk mobile phone. Rosario heard Dean ask the petitioner to pick him up and give him a ride. Rosario testified that there was no mention of a robbery or plans to confront Dixon on this call. The petitioner first drove to a house where Dean had indicated that he was located. Upon determining that Dean was not there, they drove for approximately ten minutes and parked near a hotel, where Rosario saw Dean standing near another car in which Dixon, the victim, was seated in the driver's seat. Dean started walking toward the petitioner's vehicle. Rosario testified that Dean had a gun but that the petitioner did not. Dean opened the petitioner's car door and ordered him out of the car. Rosario then saw Dean and the petitioner approach Dixon's car, where Dean pointed his gun at Dixon and said something to the petitioner. The petitioner leaned into the car to pat down Dixon, then stepped away from the car, at which point Dean started shooting at Dixon. Although Rosario testified that only Dean had a gun, at one point she also stated "[a]nd then they just start shooting."[10] Rosario stayed in the petitioner's car during the confrontation and could not hear what was said between the three men. After the petitioner and Dean ran back to the petitioner's car, Rosario asked to be dropped off.

Rosario was asked at the habeas trial "had the defense attorney come and found you, would you have testified at [the petitioner's] trial and told this story?" She responded that she would have done so. However, she also testified that she was aware that a crime had

been committed and had made no efforts to speak to the police even after hearing that the petitioner had been arrested, despite characterizing their relationship as that of "good friends." She then explained on redirect that she did not go to the police because she did not want to be involved, as she was afraid that she would end up in jail or that the victim's family or Dean's family could hurt her or her family.

The habeas court agreed that the petitioner provided Romano with "very little useful information" that could be used to locate the woman but ultimately ruled that counsel's representation was deficient because counsel took no steps to locate her: "Hiring one or more . . . expert witnesses can readily be distinguished from utilizing an investigator to find and interview a potential fact or eyewitness who is identified in the police report. The police report placed an unknown woman (i.e., 'T') inside the vehicle during the robbery and shooting. Reasonably competent defense counsel would hire and utilize an investigator to conduct an investigation that is limited in scope: finding 'T' and discerning if she had information that would assist the defense. The court finds that . . . Romano was deficient for not utilizing an investigator to locate . . . Rosario."

However, the court concluded that Romano's failure to investigate Rosario did not result in prejudice to the petitioner. The court found that "she was not willing to come forward and assist the defense at the time of the trial for fear of the codefendant, Dean. Efforts by counsel to locate . . . Rosario would not, therefore, have likely resulted in her cooperating with the investigation in a manner that assisted the defense." Ultimately, the habeas court determined that, "[a]lthough this court has concluded that . . . Romano was deficient for not utilizing an investigator to locate . . . Rosario, it would be too speculative to assess whether the absence of her testimony at the criminal trial inured to the petitioner's prejudice."

As a preliminary matter, we set forth the general principles surrounding ineffective assistance of counsel claims and our standard of review. "In *Strickland* v. *Washington*, [466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's

claim if he fails to meet either prong." (Internal quotation marks omitted.) *Vazquez* v. *Commissioner of Correction*, 128 Conn. App. 425, 430, 17 A.3d 1089, cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011).

As to the first prong, the habeas court found that Romano's representation was deficient because Romano did not hire an investigator to locate and to interview Rosario. The respondent, the Commissioner of Correction, has not challenged this finding on appeal.

"To satisfy the second prong of *Strickland*, that his counsel's deficient performance prejudiced his defense, the petitioner must establish that, as a result of his trial counsel's deficient performance, there remains a probability sufficient to undermine confidence in the verdict that resulted in his appeal. . . . The second prong is thus satisfied if the petitioner can demonstrate that there is a reasonable probability that, but for that ineffectiveness, the outcome would have been different." (Internal quotation marks omitted.) *Horn* v. *Commissioner of Correction*, 321 Conn. 767, 776, 138 A.3d 908 (2016).

"In a habeas appeal, although this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Griffin* v. *Commissioner of Correction*, 119 Conn. App. 239, 241, 987 A.2d 1037, cert. denied, 295 Conn. 912, 989 A.2d 1074 (2010). With the foregoing principles in mind, we now address the merits of the petitioner's claim.

The petitioner claims that the court erred in concluding that Romano's failure to investigate Rosario and to present her testimony did not prejudice the petitioner's case. We are not persuaded. Because the court's conclusion was premised on a factual finding, we first apply the clearly erroneous standard of review to that finding.[11] "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed [on appeal] unless they are clearly erroneous. . . . Thus, [t]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . Thus, the court's factual findings are entitled to great weight. . . . Furthermore, [a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." (Citations omitted; internal quotation marks omitted.) *Orcutt* v. *Commissioner of Correction*, 284 Conn. 724, 741–42, 937 A.2d 656 (2007).

The habeas court's conclusion of no prejudice was predicated on its finding that Rosario would not have been willing to assist the defense at the time of the trial. Although the petitioner stresses that Rosario responded in the affirmative when asked if she would have testified if approached by defense counsel, there is sufficient support in the record to discredit her statement. Even after characterizing her relationship with the petitioner as that of "good friends" and unequivocally stating that she witnessed Dean shoot the victim and that she knew the petitioner had been arrested, Rosario testified that she made no efforts to contact the police to tell them what she had witnessed. The following colloquy occurred on redirect examination of Rosario:

"Q. Miss Rosario, why didn't you go to the police?

"A. Because I didn't want to be involved.

"Q. Why not?

"A. I have a life and children and I was pregnant. And I didn't know what possibly—what could happen. . . .

"Q. Did you believe that someone could hurt you or your family if you came forward in this case?

"A. Yes. . . .

"Q. Who were you afraid might hurt you or your family?

"A. The victim's family or [Dean's] family."

In arguing that the court's factual finding is clearly erroneous, the petitioner contends that "[t]he habeas court ignored the distinction between Rosario not coming forward independently, and Rosario coming forward if she was approached by trial counsel and asked to testify." However, we agree with the respondent that "[t]he habeas court's conclusion that the petitioner failed to establish that Rosario would have presented helpful testimony amounted to a discrediting of her testimony that, if she had been located and called to testify at the criminal trial, she would have testified in the same manner as she testified at the habeas trial." The habeas court's finding that Rosario was not willing to assist the defense at the time of the trial is an implicit credibility finding. The habeas court was free to reject her testimony that she would have testified at the petitioner's criminal trial as she did at the habeas trial. We must assume that the habeas court carefully weighed Rosario's testimony that she would have cooperated if approached by counsel against her testimony that she was afraid to be involved, and found the former to be not credible. "[A] pure credibility determination . . . is unassailable." *Breton* v. *Commissioner of Correction*,

325 Conn. 640, 694, 159 A.3d 1112 (2017); see also *Sanchez* v. *Commissioner of Correction*, 314 Conn. 585, 604, 103 A.3d 954 (2014) ("[W]e must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.)). Accordingly, we cannot conclude that the habeas court's factual finding is clearly erroneous.

Having accepted the habeas court's finding that Rosario would not have assisted the defense at the time of trial, we agree with the habeas court's ultimate conclusion that Romano's failure to investigate the potential witness resulted in no prejudice to the petitioner's defense. We agree with the habeas court's conclusion that "it would be too speculative to assess whether the absence of her testimony at the criminal trial inured to the petitioner's prejudice." The petitioner cannot establish that there is a reasonable probability that the outcome of his trial would have been different even if Romano had investigated Rosario.[12]

Because we have concluded that the habeas court's ruling was proper pursuant to its credibility determination of Rosario, we decline to address the petitioner's claim that the habeas court erroneously found that Rosario did not substantially corroborate the petitioner's version of events.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The second amended habeas petition included claims of conflict of interest, ineffective assistance of trial counsel, a violation of due process, and actual innocence. The habeas court denied all four counts. On appeal, the petitioner challenges only the counts pertaining to conflict of interest and ineffective assistance of counsel.

[2] The petitioner alleged seventeen potential failures of trial counsel in the second amended petition, but he advances only the failure to investigate Rosario on appeal. The habeas court denied all seventeen allegations of ineffective assistance.

[3] In *Ake* v. *Oklahoma*, supra, 470 U.S. 86–87, the United States Supreme Court held that, when an indigent defendant's mental state at the time of the offense is likely to be a significant factor at trial, due process requires that a state provide access to a psychiatric expert to assist in preparing a defense.

[4] The petitioner has not challenged the indigency finding or the denial of the motion for expenses.

[5] Because the petitioner argues on appeal that the conflict of interest arises from the conduct of Romano in not paying for experts himself, rather than from the trial court's findings of indigency and denial of the various motions for funding for expert witnesses, we conclude that this exception does not apply to the petitioner's appeal.

[6] In support of its assertion that the petitioner's conflict of interest claim is procedurally defaulted, the respondent, the Commissioner of Correction, has also framed this claim as a failure to appeal from the denial of the motions for ancillary expenses and the findings of indigency. Specifically, the respondent argues that "[b]ecause the petitioner has presented no evidence and argument to explain why he did not previously challenge the trial court's ruling on Romano's request for ancillary funds, and has only

argued why he did not claim a conflict of interest at trial and on direct appeal, he necessarily has failed to establish the requisite cause and prejudice to excuse his procedural default." The petitioner's claim, however, is directed not at the denial of the motions for ancillary expenses but rather at Romano's conduct in the aftermath of such denials. We conclude that the petitioner's failure to raise the trial courts' indigency findings and denial of payment for ancillary expenses in his direct appeal does not preclude the petitioner from making a conflict of interest claim in a habeas corpus proceeding.

[7] We note that the petitioner does not argue on appeal that his counsel's failure to call the experts constituted ineffective assistance.

[8] The petitioner's statement of issues and introductory portion of his conflict of interest argument also aver that his rights under article first, §§ 8 and 9, of the constitution of Connecticut were violated. However, beyond these cursory mentions, the petitioner's brief does not contain any substantive analysis of potential Connecticut constitutional violations. Accordingly, we decline to review these claims. See *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.)).

[9] As the respondent, the Commissioner of Correction, correctly points out, if Romano unreasonably failed to investigate the petitioner's case or to present any expert witness at trial, the petitioner's recourse would be to claim, under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), that Romano rendered ineffective assistance of counsel. In the present case, the petitioner made that claim only with respect to Romano's failure to locate and to call Rosario, the potential eyewitness.

[10] Insofar as this statement suggests that there were two shooters, we note that the petitioner describes this statement as a mistake, which is amply supported by evidence in the record, as Rosario repeatedly testified that Dean was the only person with a gun.

[11] The petitioner, citing *State* v. *Clark*, 297 Conn. 1, 997 A.2d 461 (2010), claims that "when a constitutional issue turns upon a factual finding, a reviewing court must conduct a scrupulous examination of the record to determine whether a lower court's finding is supported by substantial evidence." Although *Clark* includes language supporting that statement, *Clark* and the line of cases cited therein make it clear that the substantial evidence standard applies to "review of a trial court's findings and conclusions in connection with a motion to suppress." Id., 7; see *State* v. *DeMarco*, 311 Conn. 510, 519, 88 A.3d 491 (2014); *State* v. *Burroughs*, 288 Conn. 836, 843, 955 A.2d 43 (2008). Accordingly, we apply the well established definition of clearly erroneous when evaluating the court's factual findings.

[12] We note that the petitioner claims that "the habeas court failed to state and apply the correct prejudice standard—the 'reasonable probability' standard. . . . Nowhere in the habeas court's decision . . . does it state or apply the 'reasonable probability' standard." We agree with the respondent that the habeas court expressly stated that it was applying the prejudice test from *Strickland*, which is the reasonable probability standard. The habeas court appropriately and extensively discussed the relevant principles from *Strickland*, as well as our Supreme Court's ineffective assistance of counsel jurisprudence as set forth in *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 664. The mere fact that the habeas court did not use the precise phrase "reasonable probability" in its conclusion regarding Rosario's testimony is insufficient to give us the impression that the court failed to apply the appropriate standard, particularly where we have agreed with the habeas court's prejudice determination.